02-10-499-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00499-CR

 

 


 
 
 Jerry Lee Pitman
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 30th
District Court OF Wichita COUNTY

----------

OPINION

----------

INTRODUCTION

Appellant
Jerry Lee Pitman pleaded guilty to two counts of aggravated sexual assault
without an agreed punishment recommendation.  The trial court sentenced
Appellant to two consecutive life sentences.  In three related issues,
Appellant asserts that the trial court abused its discretion by denying his
motion for new trial, in which he alleged that the State’s failure to disclose
documents prior to his guilty plea and punishment hearing violated his due
process and due course of law rights.[1]  Appellant specifically
argues that the State violated the dictates of Brady v. Maryland by
failing to disclose 3,000 pages of Child Protective Services (CPS) records
containing among other documents notes from the complainant’s therapy sessions
that were inconsistent with the complainant’s and the therapist’s trial
testimony.[2]  See 373 U.S. 83,
83 S. Ct. 1194 (1963).  We affirm.

APPLICABLE
LAW

          In
Brady v. Maryland, the United States Supreme Court held “that the
suppression by the prosecution of evidence favorable to an accused upon request
violates due process where the evidence is material either to guilt or to punishment,
irrespective of the good faith or bad faith of the prosecution.”  373 U.S. at
87, 83 S. Ct. at 1196–97; see Pena v. State, 353 S.W.3d 797, 809
(Tex. Crim. App. 2011).  The court of criminal appeals has held that to find
reversible error under Brady, an appellant must show that (1) the State
failed to disclose evidence, regardless of the prosecution’s good or bad faith;
(2) the undisclosed evidence constitutes exculpatory or impeachment evidence
that is favorable to him, that is, if disclosed and used effectively, the
evidence may make a difference between conviction and acquittal; and (3) the
evidence is material, that is, it presents a reasonable probability that had
the evidence been disclosed, the outcome of the proceeding would have been
different.  Pena, 353 S.W.3d at 809, 812; Harm v. State, 183
S.W.3d 403, 406, 408 (Tex. Crim. App. 2006).  We analyze an alleged Brady
violation “in light of all the other evidence adduced at trial.”  Hampton v.
State, 86 S.W.3d 603, 612–13 (Tex. Crim. App. 2002).

          We
review a trial court’s ruling on a motion for new trial for an abuse of
discretion.  Webb v. State, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); Holden
v. State, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006).  We view the evidence
in the light most favorable to the trial court’s ruling and uphold it if it was
within the zone of reasonable disagreement.  Webb, 232 S.W.3d at 112. 
We do not substitute our judgment for that of the trial court, but rather we
decide whether the trial court’s decision was arbitrary or unreasonable.  Id.;
Holden, 201 S.W.3d at 763.

PROCEDURAL
AND FACTUAL BACKGROUND

          In
2009, the State charged Appellant with sexually assaulting S.P., a child younger
than fourteen years of age, on two occasions in 2008.  On August 9, 2010,
Appellant waived a jury trial and pleaded guilty to the two counts without a
recommendation on punishment.  Following Appellant’s plea, the prosecutor
advised that,

initially during her
disclosures the victim only disclosed two incidents of aggravated sexual
assault, and that’s why the indictment has two counts.  However, I spoke with
the victim last Monday and she disclosed sexual misconduct on the part of
[Appellant] from age nine to age twelve, and I immediately picked up the phone
to call [defense counsel] who wasn’t available at the time, but I did send him
an e-mail just to satisfy my Brady duties.

Appellant
acknowledged receiving the email.  The trial court stated that he would grant
Appellant a recess before his cross-examination of S.P. if he needed one.

The
next day, the State presented evidence that twelve-year-old S.P. delivered a
baby boy at a local hospital in May 2009.  After initially claiming she did not
know who the baby’s father was, S.P. reluctantly told a nurse that the baby’s
father was her stepfather, Appellant.  The nurse contacted CPS, and subsequent
DNA testing confirmed that Appellant was the baby’s father.

CPS
Investigator Kathy Meyer testified that she met with S.P. at the hospital after
the baby’s birth and that S.P. described in detail—once to Meyer and once to
Meyer and Detective Alan Killingsworth—how Appellant had sexual intercourse
with her two times between June and September 2008 at their home, where they
lived with S.P.’s four half-siblings and Appellant’s parents and brother.

Ashlee
Bowles testified that she was a CPS caseworker for this family and that she met
with Appellant in April 2010 while he was incarcerated.  Appellant told Bowles
that he was “cracked out” when the abuse occurred and that it never would have
happened “at least six times” if he had been sober.

The
next day, Appellant objected to any testimony by S.P. regarding any sexual
abuse not alleged in the two-count indictment, asserting that he had requested
notice of extraneous offenses a year earlier (which the State disputed).  The
prosecutor reiterated that she had not been aware of the additional sexual
abuse until the Monday before, when S.P. told her.  The prosecutor explained that
she had called Appellant’s counsel that same day, and upon learning that he
would be out of the office for a few days, she sent him an email.  Defense
counsel, having previously acknowledged receiving the email, stated that he did
not think the State had acted in bad faith but that “the purpose of the notice
is to allow us to prepare” and that “if we know simply that there’s sexual
abuse and don’t know anything else, I don’t know how we can prepare.”  The
trial court ruled that, in light of caseworker Bowles’s unobjected-to testimony
that Appellant had admitted to six incidents of abuse, he would allow S.P. to
testify to six incidents and that he would grant Appellant a continuance before
cross-examination if requested.[3]

S.P.
testified that Appellant first touched her inappropriately when she was nine
years old.  When the prosecutor asked about other instances, S.P. responded,
“Well, I know that it happened almost all the time.”  S.P. then testified that
Appellant first had sexual intercourse with her when she was eleven years old. 
S.P. described the incident and explained that she was shocked the first time
but that as she got older she “just g[o]t used to it.”  S.P. testified that a
CPS caseworker came to their house in 2008 (in response to a referral of five
children living in a dilapidated house) and that the caseworker told Appellant
to stop sleeping in the same bed as S.P.  In response, Appellant began picking
up S.P. from school early and having intercourse with her in her grandmother’s
bed when no one was home but an uncle.  S.P. testified that Appellant “put his
penis inside [her] privates” the same summer that she became pregnant and that
the last time was one week before the baby was born.  The prosecutor then
elicited testimony from S.P. that she told “the CPS person” that it only
happened twice because she was scared, because she did not want anything bad to
happen to her stepfather, and because she did not want her brothers and sisters
to get hurt and hate her.

On
cross-examination, Appellant elicited from S.P. that she gave a November 2009
videotaped interview and that she did not tell the CPS interviewer about the
other sexual abuse incidents about which she had testified.  When Appellant
tried to introduce the DVD as impeachment evidence, however, the State objected
that he had not laid the proper predicate, and the trial court agreed.  Appellant
then elicited testimony from S.P that she told both Kathy Meyer and Detective
Killingsworth at the hospital that the sexual abuse happened on only two
occasions.  He also elicited the following testimony:

          [Defense
Counsel]: Q.  And so then you — you went ahead and told them at that time that
you were telling the truth; is that right?

 

          [S.P.] A. 
Yes, sir.

 

          Q.  But
today you’re saying that that really wasn’t the truth; is that right?

 

          A.  Sir, it
was the truth.  But honestly, I didn’t want to tell everything because I don’t
like to get people in trouble.

 

          . . . . 

 

          Q.  [Y]ou
later had a chance to talk to CPS and did talk to CPS.  Right?

 

          A.  Yes,
sir.

 

          Q.  And you
never explained any of this to them at that point in time, did you?

 

          A.  No,
sir.  

When
S.P. finished testifying, Appellant’s counsel asked for a short recess but
stated, “I don’t contemplate asking — I don’t want a continuance, I want to get
it done, but I don’t want to —.” 

          When
the hearing resumed, Laura Greuner testified that she was a licensed clinical
social worker and S.P.’s therapist.  Greuner testified that she diagnosed S.P.
with Post-Traumatic Stress Disorder (PTSD) and explained that PTSD “is an
anxiety disorder that people get when they go through serious traumas where
[either their] life is threatened or the integrity of their body is
threatened.  And that’s how sexual abuse comes into it.”  Greuner testified
that S.P. exhibited signs that were consistent with sexual abuse, such as
anxiety and nightmares.  Greuner testified that S.P. will have issues
associated with her stepfather’s sexual abuse for the rest of her life.  On
cross-examination, Appellant’s counsel elicited testimony from Greuner that
S.P. would be able to “have times when she enjoys a normal life just like she
does now.”

          In
his case in chief, Appellant presented evidence that he had an IQ of 77,
placing him in the borderline range of intellectual functioning; that he could
be a productive citizen if provided structure and supervision; that he had been
a hard worker at times; and that he had been a good father in many respects.  Appellant’s
defense counsel argued the following in closing argument: 

[T]he evidence
establishes without any doubt that he’s — that he’s guilty of this offense.  So
we don’t argue with that.  That’s why we pled guilty.  I think the evidence
supports that. 

 

However, as the Court
knows from my evidence in court, this late-breaking evidence of other bad
things that’s just appeared recently the last week is something that I think
that the Court in judging credibility can rightly give little weight to because
I think — I’m suspicious anytime evidence appears just at the last minute.  And
I think the Court would be warranted in being suspicious of the evidence that
appears at the last minute about other things that supposedly happened that
weren’t known and weren’t talked about.

 

[T]he testimony of
Detective Killingsworth and Kathy Meyer and the nurse about what was said to
them by [S.P.] and about these two experiences that Maureen has talked about is
quite specific.  

 

. . . .

 

When you have
somebody at the time giving that — those details and giving it right after
something dramatic like giving birth has occurred, I think you’ve got
reliability and trustworthiness in those statements to a certain extent, but I
think you have — you have that especially when you have the details. 

 

This other
late-breaking stuff, I would just ask the Court not to — not to give that — I’d
ask don’t give it any weight.  But for whatever it is, it certainly never
appeared — none of the other State’s witnesses said anything about it, so I
think it’s to be given little weight.

One
week later, the trial court found Appellant guilty on both counts and sentenced
him to two consecutive life sentences.  On September 16, 2010, Appellant filed
a motion for new trial, and the trial court held a hearing on October 1, 2010.

At
the motion for new trial hearing, Appellant’s counsel elicited testimony from
attorney Joe Steimel that Steimel represented Appellant in his civil parent-child
termination proceedings.  Steimel testified that on August 5, 2010, during
Appellant’s punishment hearing, he received an email from an assistant district
attorney who represented CPS, stating that the “de-identified file” was ready.  Steimel
testified that six or seven days later he picked up the records, that he was
told that there were 3,300 pages of documents, and that he had provided those
documents to Appellant shortly before Appellant filed his motion for new trial
on September 16, 2010.

The
lead prosecutor testified that the District Attorney’s Office had an open file
policy except that “as criminal district attorney we represent [CPS], and they
are separate and apart from the felony prosecutors or the misdemeanor
prosecutors.”  The prosecutor testified that there were two proceedings pending
against Appellant—the criminal proceeding and the CPS petition to terminate his
parental rights.  She explained that she had “nothing to do with” the civil
side of the office representing CPS because “the civil side of our office that
represents the [CPS] has attorney/client privileges, and I certainly don’t want
to divulge any information that is exchanged between the attorney and [CPS].”  The
prosecutor explained that she subpoenaed CPS records related to Appellant’s
case directly from the custodian of records for CPS and did not “go over to the
other side of the office to get any records,” “to cover [herself] with regard
to Brady and [her] duties as an attorney” and to “cover [herself] that
[she] requested everything that’s related to the criminal case to [her] office
so that it [could] be viewed by the defense.”

The
prosecutor testified that at some point Appellant’s counsel subpoenaed
essentially the same records and that a CPS representative called and asked the
prosecutor to provide Appellant’s counsel with a copy of the documents already
provided to the prosecutor by CPS.  Appellant’s counsel agreed, and the
prosecutor provided copies of all the CPS documents she had received from CPS,
which was approximately 150 pages.

ANALYSIS

Appellant
contends that the trial court erred by denying his motion for new trial.  The
basis of Appellant’s claim is that, after his sentencing hearing, he discovered
(based on documents received from his civil, termination attorney) that the
prosecution had failed to disclose 3,000 pages of impeaching and exculpatory
documents (that were, at all pertinent times, located in the files of the
Criminal District Attorney’s Office) and that, therefore, the State violated
the dictates of Brady v. Maryland.[4]  Despite Appellant’s
reference to exculpatory materials, he does not identify or discuss any
undisclosed exculpatory evidence.  Thus, we address only the impeachment value
of the undisclosed documents.

The
due process clause requires the prosecution to disclose only evidence that is
(1) favorable to the defendant and (2) material either to guilt or punishment. 
United States v. Bagley, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379
(1985); Brady v. Maryland, 373 U.S. at 87, 83 S. Ct. at 1196–97. 
Because Appellant fails to demonstrate that the documents were material to his
guilt or punishment, the State was not obligated to disclose the documents to
the defense.  We nonetheless briefly discuss the disclosure practices
highlighted in this case.

First
Brady Prong

Under
Brady v. Maryland, the State has a constitutional duty to disclose to a
defendant material, exculpatory and impeachment evidence in its possession.  See
Pena, 353 S.W.3d at 810.  This duty also requires the State to learn of Brady
evidence known to others acting on the State’s behalf in a particular
case.  Harm, 183 S.W.3d at 406 (citing Kyles v. Whitley, 514 U.S.
419, 437–38, 115 S. Ct. 1555, 1567–68 (1995)); Ex parte Mitchell, 977
S.W.2d 575, 578 (Tex. Crim. App. 1997), cert. denied, 525 U.S. 873 (1998)
(noting that Brady requires the State to disclose material exculpatory
evidence in the possession of police agencies and other parts of the
prosecutorial team).  The State does not have such a duty if the defendant was
actually aware of the evidence or could have accessed it from other sources.  Pena,
353 S.W.3d at 810. 

Although
we decide this appeal on a different issue, two items in the record have given
us pause.  One of our concerns mirrors that expressed by the trial court at the
new-trial hearing: 

          THE COURT: 
[I]’m looking at the subpoenas that the State issued for pseudonym records,
[Appellant’s] records, and [his mother’s] records.  For the record, they were
filed with the clerk on June the 15th.  Each one reads as follows:  Please
furnish instanter any and all records pertaining to the following individuals,
and then there’s one for each of the three.

 

          Ms. [Prosecutor],
do you have any reason why that broad request would not have included all
records that CPS had?  I mean, it doesn’t say criminal prosecution, it doesn’t
say civil, it just names persons.  I mean, it’s obvious just from the volume of
records that you didn’t get everything you subpoenaed.  I mean, I don’t
understand how that would — I mean, I think you subpoenaed them and then the
record indicates you gave [Appellant] just a copy of what you got.  But —

 

          [The
State]:  Right.  I haven’t compared the two.  Although I’ve looked at the two —

 

          THE COURT: 
Right.

 

          [The State]   —
I haven’t compared them side by side.  But my intent was to receive any and all
records —

 

          THE COURT: 
Well, I mean, it’s obvious that your records that you and [defense counsel] worked
off of was about an inch thick and that other is a banker’s box full of
records. 

 

          [The
State]:  That’s correct.  But I don’t know what records pertained to the other
four children that I didn’t reference in my subpoena or Baby [M] or any of that
or the psychological or — I’m not quite sure.  

 

          THE COURT: 
So you’re — are you — do you think State’s Exhibit No. 1 [the undisclosed 3,000
pages of materials] then contains records referring to all the children?

 

          [The
State]:  Yes.

 

          THE COURT: 
It doesn’t appear to me that [the CPS representative] honored the subpoena.  So
I would like in the future, rather than allowing CPS to provide the records by
delivering them to an investigator, I want a CPS records custodian here to
swear to the truth of it.  And if it turns out it’s not true, there’s something
the Court can do to enforce that.  All right.

We
are also concerned that the District Attorney’s Office believes that an office
policy—to keep its criminal case files “separate and apart” from its civil CPS
case files—always absolves it from its Brady duties.  See Harm,
183 S.W.3d at 407 (“While we have held that CPS case workers may be law
enforcement officers or state agents in some circumstances, an examination of
the entire record is required to determine whether a CPS employee was a state
agent in a given situation.”) (footnotes omitted).  Again, however, resolution
of these two matters is not necessary to the disposition of this appeal.[5] 
See Tex. R. App. P. 47.1.

Second
Brady Prong

To
succeed on a Brady claim, Appellant must show that the evidence withheld
by the State was “favorable” to his case.  Favorable evidence is that which, if
disclosed and used effectively, “may make the difference between
conviction and acquittal.”  Pena, 353 S.W.3d at 811 (quoting Bagley,
473 U.S. at 676, 105 S. Ct. at 3375).  Favorable evidence includes impeachment
evidence, which is evidence that disputes, disparages, denies, or contradicts
other evidence.  Id. at 812; Harm, 183 S.W.3d at 408.

While
Appellant makes much of the fact that the undisclosed documents total
approximately 3,000 pages,[6] he did not highlight any
information or specific documents within those 3,000 pages at the motion for
new trial hearing or now on appeal, except for thirty-three pages of Greuner’s
therapy notes contained within the CPS documents.  Other than the Greuner
notes, Appellant simply describes categories of documents contained within the
voluminous records and does not point this court to any specific documents.[7] 
Thus, we address Appellant’s arguments in the context of what we will refer to
as the Greuner therapy notes.  See Tex. R. App. P. 38.1(i); Segundo
v. State, 270 S.W.3d 79, 106 & n.1 (Tex. Crim. App. 2008) (op. on
reh’g) (reiterating that it is not an appellate court’s task to wade through
voluminous records to verify an appellant’s claim), cert. denied, 130 S. Ct. 53
(2009); see generally Gomez v. State, No. 02-07-00284-CR,
2009 WL 806906, at *1 (Tex. App.—Fort Worth  Mar. 26, 2009, pet. ref’d) (mem.
op., not designated for publication) (overruling certain issues as inadequately
briefed because appellant failed to “point this court to the specific documents
on which he relies among the voluminous documents contained in the two boxes of
sealed documents submitted to and held by this court”).

Appellant
asserts that the undisclosed documents are favorable because they would have
“strengthened the proposition that the extraneous instances of sexual abuse did
not occur at all” and that “[t]he Greuner therapy notes including statements by
S.P. contradicted and called into question the extent of the abuse testified to
at trial and undermined the credibility of S.P. and Greuner.”  Appellant does
not, however, discuss specific statements contained in the Greuner notes, and
he does not specify how he would have used the notes to challenge S.P.’s
and Greuner’s credibility.[8]  Indeed, our review of
the notes indicates that, while arguably not as detailed as S.P.’s testimony
regarding the extraneous sexual abuse, S.P.’s and Greuner’s testimonies were generally
consistent with the notes.[9]  Appellant does not point
us to any portion of the notes that “dispute[d], disparage[d], denie[d], or
contradict[ed]” S.P. or Greuner’s testimony.  To the extent Appellant focuses
on the omission of statements, he does not further explain or point us to any
specific portion of the notes that support his argument.  Further, Appellant
does not explain how Greuner’s therapy notes would have been admissible to
impeach S.P. or Greuner; indeed, S.P. acknowledged that she had not told
CPS about Appellant’s ongoing sexual abuse.  See Tex. R. Evid. 613;[10]
see Pena, 353 S.W.3d at 809 (“[W]e require that the evidence
central to the Brady claim be admissible in court.”); Lempar v. State,
191 S.W.3d 230, 240–41 (Tex. App.—San Antonio 2005, pet. ref’d) (“The State’s
duty under Brady does not extend to turning over evidence that would not
be admissible at trial.”).  Thus, Appellant has not established that the undisclosed
documents are favorable. 

          Even
assuming that the undisclosed documents contained some impeachment value,
however, Appellant’s claims still fail because he is unable to satisfy the
remaining materiality requirement. 

Third
Brady Prong 

          To
succeed in his Brady claim, Appellant must also show that that there is
a reasonable probability that, had the evidence been disclosed to the defense,
the result would have been different.  Ex parte Adams, 768 S.W.2d 281,
291 (Tex. Crim. App. 1989).  Appellant asserts that “[t]he test applied to a
defendant who enters a guilty plea is . . . whether the failure to produce the
hidden material would have given rise to a reasonable probability that but for
the failure to disclose the Brady material the defendant would not have
entered the plea that he did.”  See Tate v. Wood, 963 F.2d 20 (2nd Cir.
1992).  Appellant asserts generally that the undisclosed documents were
material because he “never would have pursued the course and strategy that he
did had he known of the undisclosed material.”[11] 

We
note that while Appellant characterizes his criminal proceeding as a guilty
plea for purposes of this materiality test, he later claims that his case “was
in all other respects a contested punishment hearing.”[12]
 To the extent Appellant’s criminal proceeding can be characterized as a guilty
plea, we determine whether he would not have entered a plea but would have gone
to trial because of the objective likelihood of being found not guilty.  See
Tate, 963 F.2d at 24.  “[T]he inquiry is an objective one that is
resolved largely on the basis of the persuasiveness of the withheld evidence.” 
Id.  To the extent Appellant’s punishment hearing was more like a trial,
we determine whether in light of all the evidence, it is reasonably probable
that the outcome of the proceeding would have been different had the prosecutor
made a timely disclosure.  See Pena, 353 S.W.3d at 812.  A
reasonable probability is one that is sufficient to undermine confidence in the
outcome of the trial.  Harm, 183 S.W.3d at 409.  “The mere possibility
that an item of undisclosed information might have helped the defense, or might
have affected the outcome of the trial, does not establish ‘materiality’ in the
constitutional sense.”  United States v. Agurs, 427 U.S. 97, 109–10, 96
S. Ct. 2392, 2400 (1976); see Pena, 353 S.W.3d at 812.  Ultimately,
Appellant does not demonstrate that the undisclosed impeachment evidence was
materially significant to either his guilty plea or to the outcome of his
punishment hearing.

DNA
testing confirmed that Appellant impregnated his twelve-year-old stepdaughter
S.P.  Appellant’s trial counsel argued during the punishment hearing that “the
evidence establishes without any doubt that [Appellant’s] — that he’s guilty of
this offense.  So we don’t argue with that.  That’s why we pled guilty.  I
think the evidence supports that.”  While Appellant made this argument before
he was aware of the undisclosed materials, he does not demonstrate objectively
how or why his knowledge that S.P. did not disclose to CPS workers that she
suffered ongoing sexual abuse by Appellant would have changed his plea.  Thus,
there is not a reasonable probability that but for the failure to produce the
undisclosed information he would not have entered the plea but instead would
have insisted on going to trial. 

Further,
S.P. testified to the impeaching facts; that is, she admitted on direct and
cross-examination that she had omitted details of the extraneous incidents of
sexual abuse when talking to CPS.  “If the witness acknowledges impeaching
facts during [her] testimony, nondisclosed information bearing on those facts
is not ‘material’ under Bagley.”  42 George E. Dix & John M.
Schmolesky, Texas Practice Series: Criminal Practice & Procedure '
27:19 (3d ed. 2011) (citing Etheridge v. State, 903 S.W.2d 1, 20 (Tex.
Crim. App. 1994)).  Additionally, Appellant emphasized in his closing argument
to the trial court that S.P.’s “late-breaking” testimony regarding the
extraneous acts of sexual abuse should be viewed with suspicion and given
little weight.  See Wyatt v. State, 23 S.W.3d 18, 27 (Tex. Crim.
App. 2000) (holding that undisclosed pretrial statement by victim’s mother to
investigator that defendant had not previously hurt the victim and would not
sexually assault him was not material because the mother testified on direct
examination to “materially the same” information and therefore the defendant
was able to cross-examine her about the exculpatory facts); Saldivar v.
State, 980 S.W.2d 475, 486 (Tex. App.—Houston [14th Dist.] 1998, pet.
ref’d) (holding that while defendant could have offered witness’s theft
conviction, if disclosed, to impeach her credibility with jurors, witness’s
inconsistent statements permitted defendant “to accomplish the same goal on
cross-examination”).

In
light of the DNA results, the trial court could have understandably found S.P.
credible when she testified that the sexual abuse happened more than twice and
when she explained why she did not report the ongoing abuse.  In turn, the
trial court could have reasonably found that S.P.’s earlier omissions regarding
the ongoing sexual abuse did not undermine confidence in the outcome of the
proceeding.  Moreover, S.P.’s credibility was strengthened by the testimony of
CPS caseworker Ashlee Bowles that Appellant recounted to her that he was
“cracked out” when the abuse occurred and that it never would have happened “at
least six times” if he had been sober.  Thus, there is not a reasonable
probability that, had the evidence been disclosed, the result of the proceeding
would have been different.

For
the above reasons, we hold that the trial court did not abuse its discretion by
denying Appellant’s motion for new trial, and we overrule Appellant’s three
issues.

Conclusion

          Having
overruled Appellant’s three issues, we affirm the trial court’s judgments.

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
DAUPHINOT, GARDNER, and MCCOY, JJ.

 

PUBLISH

 

DELIVERED: 
June 21, 2012









[1]Appellant asserts that
“Texas provides constitutional protection consistent with Brady et.
al.,” therefore we do not separately address his rights under the state
constitution.





[2]Appellant also briefly
refers to article 40.001 of the code of criminal procedure and the
corresponding four-part newly-discovered evidence test for obtaining a new
trial.  Appellant did not raise this issue in his new-trial motion or at the
new-trial hearing, however.  Because Appellant complains on appeal that the
trial court erred by denying his motion for new trial, he must have raised his
newly-discovered evidence claim during the new-trial hearing to preserve the
complaint for appellate review.  Because he did not, he has forfeited this
complaint on appeal.  See Tex. R. App. P. 33.1; Keeter v. State,
175 S.W.3d 756, 759–61 (Tex. Crim. App.), cert. denied, 546 U.S. 852 (2005).





[3]We note that the trial
court offered Appellant a continuance after Appellant objected that he had not
received 404(b), 37.07, and 38.37 notice of the extraneous offenses.  See
Tex. R. Evid. 404(b); Tex. Code Crim. Proc. Ann. arts. 37.07 (West Supp. 2011),
38.37 (West Supp. 2011).  The nondisclosure of 3,000 pages of CPS documents had
not yet been discovered, therefore, it could not have been the basis for a
continuance.  We do not find persuasive the State’s assertion that Appellant
failed to preserve error on his Brady claim for failing to seek a
continuance at this juncture.





[4]Citing Ex parte Lewis,
Appellant asserts that “Texas recognizes that Brady protects persons
accused of crimes from the withholding of material exculpatory and impeaching
evidence even in the context of guilty pleas.”  See 587 S.W.2d 697 (Tex.
Crim. App. 1979).  In United States v. Ruiz, however, the United States
Supreme Court held that neither Brady nor the federal constitution
require prosecutors to disclose impeachment information prior to entering into
a plea agreement with a defendant.  536 U.S. 622, 625–33, 122 S. Ct. 2450,
2453–57 (2002).  Because the State does not raise Ruiz and because
addressing Ruiz is not necessary to the resolution of the issues as
framed by the parties, we do not decide the applicability of Ruiz to
Appellant’s guilty pleas and three-day punishment hearing.  See Ex
parte Masonheimer, 220 S.W.3d 494, 509 n.22 (Tex. Crim. App. 2007); id.
at 513 n.20 (Keller, P.J., dissenting).





[5]We also decline to address
the State’s several arguments that Appellant had independent access to the documents
and that the State therefore had no duty to disclose the challenged documents. 
The facts underlying the parties’ arguments are not entirely clear, and resolution
of these arguments is not necessary to the disposition of the appeal.





[6]Appellant’s counsel
offered the documents as an exhibit. 





[7]Appellant states that
the undisclosed documents included “among other things,” 

 

(1) [Dr. Greuner’s]
therapy notes and reports, (2) documents relating to alleged child sexual abuse
supposedly endured by [S.P.’s] siblings, (3) documents detailing post-arrest
CPS investigations of the entire [P.] household, including [Appellant’s]
brother DeWayne, (4) records of incriminating statements made by [Appellant] to
Ashley Bowles, a CPS caseworker and trial witness, and (5) documents relating
to the abuse of [M.P.], complainant’s younger sister, allegedly inflicted by
her paternal uncle, DeWayne, who lived with both S.P. and [A]ppellant.





[8]As the State points out,
Appellant did not ask to see any of Greuner’s notes related to her direct-examination
testimony.  See, e.g., Tex. R. Evid. 612, 613, 615.





[9]For instance, Greuner
states in one set of notes from September 2009 that S.P. “talked about her
dad.  She would beg him to stop molesting her.  She was afraid and told him
so.  She kicked him once and he did stop so she wonders why she couldn’t make
him stop. . . .  She said on one occasion she awoke and he was strangling her.”






[10]Rule 613(a) provides: 

In examining a witness concerning a prior inconsistent
statement made by the witness, whether oral or written, and before further
cross-examination concerning, or extrinsic evidence of, such statement may be
allowed, the witness must be told the contents of such statement and the time
and place and the person to whom it was made, and must be afforded an
opportunity to explain or deny such statement. . . .  If the witness
unequivocally admits having made such statement, extrinsic evidence of same
shall not be admitted. 

Tex. R. Evid. 613(a)
(emphasis added). 





[11]Appellant specifically argues
that if the documentary evidence had been available and if he had known S.P.
and Greuner would accuse him of additional misbehavior, he never would have
waived his right to elect the jury to assess punishment, he may have testified
in his own behalf, he may have called other family members or third-party
witnesses, he could have investigated and called alibi witnesses, and he may
have changed his plea in order to refute culpability and allow a jury to decide
his fate.





[12]Citing Ex parte
Lewis, Appellant asserts that in the context of Brady violations
after guilty pleas, the court of criminal appeals has “found that the Due
Process Clause and Texas’ due-course-of-law provision both operate to support
the granting of a new trial under comparable procedural circumstances.”  See
587 S.W.2d at 700.  Ex parte Lewis, however, involved the failure to
disclose exculpatory evidence.  Id.; see Ruiz, 536 U.S. at
633, 122 S. Ct. at 2457.